■ JOSE GARCIA, Respondent, v FLOSSIE MARTIN, Appellant, et al., Defendant. [728 NYS2d 455] —Order, Supreme Court, Bronx County (Barry Salman, J.), entered July 18, 2000, which, to the extent appealed from, denied defendant Flossie Martin's motion for summary judgment dismissing the complaint as against her, affirmed, without costs.

Plaintiff, an employee of One Stop Shopping, a roofing contractor, was injured in a fall from the roof of defendant's home. Plaintiff was told by defendant homeowner to install plywood before applying the roofing felt and shingles. After installing plywood on one side of the roof, as directed by his supervisor, the plywood ran out, and defendant refused to pay for more, instead instructing plaintiff to use pieces of the old roof decking material to patch rotted areas. At defendant's insistence, plaintiff also reinstalled a leader and sealed defendant's gutters, which, as plaintiff testified, "had nothing to do with the job."

After the roofing felt was applied but before plaintiff and a fellow worker could begin shingling, it began to snow. Due to defendant's demand that the work be completed immediately or payment would be withheld, plaintiff went up on the roof in the attempt to keep the felt dry by sweeping the snow away with a broom. In the process, plaintiff stepped on a piece of the old wood decking, which gave way, causing him to fall.

The exemption from liability for the owners of one- and two-family dwellings provided in Labor Law § 240 (1) and § 241 (6) is limited to those "who contract for but do not direct or control the work." As Supreme Court recognized, where a worker is the employee of another, vicarious liability under the Labor

Law depends upon the degree of supervision and control exercised by the defendant (*Duda v Rouse Constr. Corp.*, 32 NY2d 405; *Ennis v Hayes*, 152 AD2d 914, 915). In *Rimoldi v Schanzer* (147 AD2d 541, 545), in which workers were killed in the collapse of a patio that was being excavated to make room for a swimming pool, the Appellate Division, Second Department, noted (at 546) that the defendants' "involvement in the construction of the pool * * * went beyond the mere choice of a pool and included their involvement in the shape, placement and construction of the pool as well as their supervision of the manner in which the pool was being constructed." The Court found issues of fact as to whether the defendants had exercised the requisite degree of supervision and control to impose liability under Labor Law § 240 (1) and § 241 (6).

As the Court of Appeals has observed, the intent of the Labor Law is to afford protection to workers by placing responsibility for job safety on the owner. To this end, doubts concerning the applicability of the exception for one- and two-family homeowners "should be resolved in favor of the general provision rather than the exception" (*Van Amerogen v Donnini*, 78 NY2d 880, 882). In the instant case, the parties have given conflicting accounts respecting the direction and control exercised by defendant over plaintiff's work. Plaintiff testified that he was given specific instructions on aspects of the work he was to perform and intimated that he and defendant had arrived at an understanding whereby he was to be compensated for work performed directly at defendant's behest, apart from the salary he received from his employer. He stated that he had agreed to seal the gutters because "she said she was going to take care of me." Defendant, by contrast, denies that she had any conversations with anyone concerning the work except for the contractor. In the context of a motion for summary judgment, the court is required to consign factual issues bearing upon a defendant's right to rely on the exemption from liability under Labor Law § 240 (1) for resolution by the trier of fact (*see, Chura v Baruzzi*, 192 AD2d 918).

Finally, viewing the facts in a light most favorable to plaintiff, as a court is required to do on a motion for summary judgment (*Ingle v Glamore Motor Sales*, 73 NY2d 183, 194; *Crosland v New York City Tr. Auth.*, 68 NY2d 165, 168, n 2), the homeowner's involvement went beyond the mere expression of dissatisfaction and demands for timely completion of the work. The direction to reuse old planking rather than install new plywood was a material contributing factor in plaintiff's injury, and the degree of interference thus implicates

both "direction as to the manner of the performance of the work by the injured work[er]" and direction as to use of materials supplied by her, even without direction as to the manner of performance (*Galbraith v Pike & Son*, 18 AD2d 39, 43, citing *Mendes v Caristo Constr. Corp.*, 5 AD2d 268, 270, *affd* 6 NY2d 729; *cf., Sanna v Potter*, 179 AD2d 982, 983, *lv denied* 80 NY2d 758 [no evidence any materials supplied by defendants contributed to accident]). Under the circumstances of this case, defects in the materials that the homeowner supplied and her insistence upon the use of the materials in the performance of the project raise questions of fact as to her direction and control of the work within the contemplation of Labor Law § 240 (1).

In an extensive dissent, our colleague attempts to decide an issue of fact, losing sight of the very purpose of summary judgment, which is to ascertain if there are issues of fact (*Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404; *Wiener v Ga-Ro Die Cutting*, 104 AD2d 331, 333, *affd* 65 NY2d 732; *Creighton v Milbauer*, 191 AD2d 162, 166).

The relevant inquiry is the degree of direction and control that the defendant had over the method and manner of work. As suggested in *Chura v Baruzzi* (*supra*), there can be no argument that defendant's activities went well beyond those of an interested homeowner, who simply presented ideas and suggestions, made observations and inquiries and inspected the work. She was at the job site daily, organizing the work and, in effect, telling the plaintiff how to do his job and what materials to use or not use.

Under the circumstances of this case, sharp issues of fact exist as to whether the defects in the material that the defendant supplied, her daily intermeddling in the work in progress, and her insistence upon the use of the old planking constituted sufficient direction and control so as to remove this action from the exemption under the Labor Law for one- and two-family dwellings. Concur—Rosenberger, J. P., Ellerin and Rubin, JJ.

Tom and Buckley, JJ., dissent in a Memorandum by Tom, J., as follows: Insofar as I conclude that the facts of this case fit squarely within the exemption afforded to single-family homeowners in Labor Law § 240 (1), I would reverse and grant summary judgment to defendant private homeowners and thus dismiss the claim of strict liability arising under section 240.

Plaintiff was an employee of One Stop Shopping, a roofing contractor hired by defendants to replace the roof of their private home in the Bronx. Defendant-appellant is the homeowner; defendant Stowe was her husband who died before this action commenced. The job basically involved stripping

and replacing the roof's shingles and its felt underlayer, as well as cleaning and refastening the gutter which became the repository of roofing debris from the job. During that work, plaintiff stepped through a rotten panel of wood and, in trying to extricate himself, lost his balance and fell. He sued defendants, as owners and employers, under Labor Law § 240 (1) and other theories.

Labor Law § 240 (1), commonly known as the "Scaffold Law," ensures protection to workers from elevation-related risks by imposing strict liability for injuries falling within the statute's purview upon contractors and premises owners. However, the statute creates an exemption for "owners of one and two-family dwellings who contract for but do not direct or control the work" (Labor Law § 240 [1]). Indisputably, this is the type of residence for which the owners, if qualified, are exempted from liability under section 240 (1) for workers injured in elevation-related incidents during contracting work on location.

The amendment to exempt qualifying homeowners was enacted in 1980 in response to Court of Appeals case law (*Allen v Cloutier Constr. Corp.*, 44 NY2d 290; *Haimes v New York Tel. Co.*, 46 NY2d 132) that had imposed strict liability on homeowners, a result that was generally viewed as harsh, unfair and unrealistic, but nevertheless also viewed as requiring a legislative rather than judicial remedy. The general thrust of the amended bill recognized that, absent extraordinary circumstances, homeowners typically did not and could not exercise supervisory control over workers—their lack of expertise was why they often had to hire contractors in the first place. As even Judge Fuchsberg, writing for the *Haimes* Court (*supra*, at 138), conceded in dicta, "[t]he owner of a one-family dwelling * * * may be in a less dominant position than the particular subcontractor [i.e., the contractor's hiree] he engages." The Law Revision Commission noted in support of the bill: "[i]t is unrealistic to expect the owner of a one or two family dwelling to realize, understand and insure against the responsibility sections 240 and 241 now (i.e., pre-amendment) place upon him" (Mem of Law Rev Commn, 1980 NY Legis Doc No. 65 [F]). The Law Revision Commission additionally urged that "while the rule of strict liability has a salutary effect in promoting responsibility among those engaged in the business of construction and repair, and to owners of buildings other than one and two family dwellings, it should not apply to owners of one and two family homes who are not in a position to know about, or provide for the responsibilities of absolute liability." Similarly, the New York County Lawyers Association observed

that the bill "realistically exempts small homeowners from requirements to provide suitable conditions for construction work. In such instances this responsibility should be that of the contractor" (June 17, 1980 letter from Richard A. Givens to Richard Brown, Counsel to Governor, Bill Jacket, L 1980, ch 670). On the issue of insurance coverage, the Law Revision Commission aptly noted the unlikelihood that homeowner's policies "would provide coverage adequate for death and permanent injuries of workers on the premises," an observation corroborated numerous times in the Bill Jacket by the remarks of individual homeowners as well as memoranda from insurance carriers in support of the exemption. Case law also notes that "[t]he exception was enacted to protect those people who, lacking business sophistication, would not know or anticipate the need to obtain insurance to cover them against the absolute liability imposed by section 240 (1)" (*Lombardi v Stout*, 80 NY2d 290, 296; *accord Cannon v Putnam*, 76 NY2d 644, 649-650; *accord Spinillo v Strober Long Is. Bldg. Material Ctrs.*, 192 AD2d 515; *accord Hook v Quattrociocchi*, 231 AD2d 882), a practical reality that we, too, have noted (*Ortiz v Pena*, 227 AD2d 297).

As noted, the statute exempts qualifying homeowners who neither direct nor supervise the work. The issue that divides us is whether these homeowners exercised sufficient direction and control over the work resulting in the injury so as to preclude them from availing the benefit of the exemption under section 240 (1).

Even if plaintiff's own testimony is fully credited for purposes of this motion, he still falls far short of establishing, based on controlling case law, the requisite direction and control exercised by the homeowners as a predicate to imposing section 240 (1) liability on them.

Plaintiff in his testimony recalled that defendant wife was aggravated when he arrived for work on the first day because work was supposed to have started a couple of days previously. After he convinced her that he was just there to work, that he intended to start work immediately, and that any dispute was with his supervisor, thus "calm[ing] her down," he asked her which side she preferred that he start the job on. Plaintiff recalled that "[s]he said *preferably* the front." (Emphasis added.) He recalled that later that day, she also asked him to clean and re-nail the gutters, which were leaky, and which he would have done as part of his job anyway. Her later request that he reseal the gutters, though, was not part of his original job, but, on the expectation of a tip, he agreed to do the reseal-

ing. The accident was entirely unrelated to the gutters, but the suggestion is made by the majority that this additional minor work somehow reinforces the extent to which the defendants directed and controlled the contracted roof job; it does not.

In any event, during the preliminary stripping work, it became apparent that some of the underlying boarding was rotted and required replacement. The parties dispute how the need for additional plywood supports came about and how much, who would pay for it, and where it was needed, which possibly led to a dispute between the contractor and the homeowners. The wife also recalled that her husband, concluding that the roofing over the living room was still good, asked that plywood not be placed in that location. The plywood dispute is relied on to somehow enhance the degree of direction and control over plaintiff exercised by defendants. However, from plaintiff's perspective, "it was a misunderstanding between them [i.e., defendants and the contractor]. That had nothing to do with me." Elsewhere, plaintiff was clear that "I was just a worker * * *. I was just there to rip off the roof, felt it and reshingle it * * *. I kept on telling her if you have any questions, call Steve [i.e., the contractor]. It had nothing to do with me." However, even the plywood was not instrumental in the injury; plaintiff's foot cracked the old boarding. Plaintiff's only interest in the plywood, aside from the additional time involved, was that cutting and placing plywood entitled him to a higher hourly wage, and that he had been hired only at a shingler's wage rate. Rather than following defendants' directions, he simply stopped work when the subject of plywood came up. Once the matter of the plywood was negotiated between the homeowner defendants and the contractor, with both apparently chary as to the additional cost, plaintiff undertook to put down plywood until it ran out, after which he replaced the old boarding.

When he arrived the second day, defendant wife was angry again because the roof had leaked as a result of rain the prior day. All along, plaintiff "understood the dispute she was having [with] the ownership of One Stop * * *. But she was taking it out on me." In other words, plaintiff was subjected to defendant wife's complaints, but did not perform subject to her orders. Plaintiff "knew what was being done with the roof because Steve had explained it to me. There was no plywood in the job when I started the job. That is why I stopped the job because if there was plywood involved, then my pay was supposed to go up. That is the reason I stopped the job." Again, this is not a worker acting under the homeowner's direction and control.

As noted, defendant wife, at plaintiff's invitation, expressed a preference that the work commence in the front. Plaintiff mentioned this to "Steve," his supervisor. Steve, possibly still chafing about the extra three sheets or so of plywood, had a different idea. Steve told plaintiff to start in the back. Plaintiff admitted where his direction and control was coming from: "so who am I going to listen to—who pays me or [who] don't." The rhetorical question apparently answered itself. However, by placing all the plywood in the back, it would run out before plaintiff got to the front of the roof. Hence, defendant wife asked him to just use plywood where the boarding was rotted, and, the roof otherwise being in good condition, to put back the old boarding elsewhere. The husband's request that plywood not be used to replace the good wood over the living room followed the same logic. Parenthetically, no new plywood had been originally contemplated, so this particular request had no bearing on the scope of the project. In any event, plaintiff proceeded to put down the new plywood as directed by his supervisor and he reused as necessary the old wood that was still good. This occupied him until about the fourth day of the job, at which time he started felting.

Plaintiff finished the felting, but early the following day— apparently the fifth day of the job—it had snowed. That was the day plaintiff intended to start attaching new shingles, a job he never got to because of his fall. On the day of the snow, defendant wife, Steve and Steve's partner "were having a big argument. She wanted the job done no matter what." When plaintiff arrived for work that day, she re-expressed her aggravation, that she "didn't care how you do it, I want the job finished or else you [presumably the contractor] are not getting paid." Plaintiff climbed the ladder, provided by his employer, with a long broom, also provided by his employer, to sweep snow off of the felt to allow the felt to dry out in the sun so that he could attach shingles. Under questioning, plaintiff was clear that this stage of the job was past the time when the wooden base was being put down, so that the issue of the plywood really has no relevance to the question whether defendants at this point were essentially directing and controlling the job. Rather, plaintiff was working under the original work order and was at the shingling stage. As he swept snow off of the roof near the peak, he "stepped on a piece of old wood. It cracked. I didn't want to go through the roof. I shifted my weight and flew right off the roof."

*Duda v Rouse Constr. Corp.* (32 NY2d 405) describes the extent of intrusion by a homeowner that is necessary before a

court will view that homeowner as having appropriated direction and control over the work being done, namely: " 'Directing', we have said, means just that; for one person to be 'directed' by another, there must be supervision of the manner and method of the work to be performed. The words are to be construed strictly and literally." (*Id.* at 409; *accord Spinillo v Strober Long Is. Bldg. Material Ctrs., supra; Kelly v Bruno & Son*, 190 AD2d 777.) In *Lieberth v Walden* (223 AD2d 978, 979), the court stated "[i]n accordance with the legislative intent, the phrase 'direct or control' is strictly construed [case cited] and, in analyzing whether an owner's action amounted to direction or control" of the work depends on the degree of supervision exercised over the method and manner in which the work is performed (*cf., Chura v Baruzzi*, 192 AD2d 918; *cf., Ennis v Hayes*, 152 AD2d 914). "[I]t requires a significant degree of participation in the work by the owner before he or she will be deemed to have crossed the line from being a legitimately concerned homeowner to a de facto supervisor" (*Lieberth v Walden, supra*, at 979). The homeowner's discussions about the work's progress and quality, the type and character of comments that would be expected of any homeowner who has hired workers, have no significance in this regard (*Hartman v Galasso*, 226 AD2d 256, 257; *accord Schwartz v Foley*, 142 AD2d 635, 636, *lv denied* 73 NY2d 702). Merely being "meticulous and discriminating homeowners" does not equate with assuming direction and control of the work (*Lieberth v Walden, supra*, at 980). The requisite direction and control must be "continuous" (*Kostyj v Babiarz*, 212 AD2d 1010, 1011).

Courts repeatedly have recognized the reality that a homeowner who hires a contractor for work on his or her house has a legitimate level of concern that the work be completed in a timely and professional manner (*Jonchuk v Weafer*, 199 AD2d 591; *Sotire v Buchanan*, 150 AD2d 971; *Sanna v Potter*, 179 AD2d 982, *lv denied* 80 NY2d 758), so that insistence on such does not ripen into the nature of the control contemplated by the Legislature as a basis to return liability to the homeowner. In the case at bar, defendants' insistence that the work be completed immediately does not seem unreasonable, considering that the contractor had already delayed the commencement of work and that it began to snow on the fifth day, which could have resulted in water leaks and resulting damage to the unfinished and exposed roof. The exposed roof already had a leak due to rain earlier. Defendants' conduct in this regard, then, cannot be deemed a significant factor in determining their purported supervision and control of the contracted-for work.

At one end of the continuum of homeowner-exercised control over the method of working, as contrasted with concerns for the timeliness and quality of the work product, are cases where the homeowner effectively acted as his or her own general contractor, in which cases the owner lost the exemption by virtue of his or her extensive and continuous supervisory control. Hence, where the owner retained the architect to prepare plans for the design and construction of his residence; subcontracted work to various companies for excavation, foundation, plumbing, electrical, septic system, rough flooring and framing work; scheduled when each such contractor could work; did much of his own work on backfilling, drain installation, landscaping, siding and roofing, and finished flooring and cabinet work; was on the site most times including the day of the accident; frequently photographed the progress of the work; often pointed out mistakes and requested corrections; and supplied materials and equipment particularly to the worker eventually injured, a jury issue was genuinely presented (*Ennis v Hayes, supra*). Similarly, where the owner engineered the entire renovation project; solicited bids, negotiated contracts and hired specialty contractors; was present at the job site daily; worked himself but also supervised the project in its entirety, organizing subcontractors and directing them when and where to work; directed plaintiff in particular which rooms to tape first, and how to do the taping, and that he tape, sand and finish owner-installed drywall; directed plaintiff and others to help him unload and move materials; and often repositioned the ladder off of which plaintiff fell, again factual issues precluded affording the owner the statutory exemption as a matter of law (*Chura v Baruzzi, supra*). However, courts have even declined to invalidate the exemption under similar though slightly less intrusive circumstances (*Lane v Karian*, 210 AD2d 549 [homeowner acted as his own general contractor, provided plans, purchased materials and hired contractors]; *Lieberth v Walden, supra* [homeowner drew the plans, hired the various contractors, was present about half of the time, redesigned aspects of the project as work progressed, and even asked the worker to double nail sheetrock, but otherwise did not tell the worker, who looked to his own supervisor for directions, how to perform his job]), so that these factors, alone, are not dispositive as a basis to impose section 240 (1) liability on the homeowner.

Moving down the continuum, conduct by owners that falls short of these factors has routinely been insufficient to overcome the exemption. Many of these cases fall into the categories of complaining about the timeliness and quality of the

work, or requesting additional changes, or inspecting the ongoing progress of the work. Courts have consistently recognized the homeowner's prerogative in these regards: he or she does not stop being an exempt homeowner merely by virtue of insisting, as a paying customer, that home improvement work and repairs be satisfactory. Hence, the mere fact of involvement with the work, when such is "no more extensive than would be expected of the ordinary homeowner who hires a contractor to remodel or renovate his home" (*Sotire v Buchanan, supra*, at 972) has little relevance regarding the applicability of the exemption. As was similarly stated elsewhere when the homeowner even provided equipment and tools: "[a] homeowner does not direct and control the work on a project for purposes of Labor Law § 240 by presenting ideas and suggestions, making observations and inquiries, and inspecting the work * * * [this is no] different from the type of control any homeowner has over work being performed on his or her house. This kind of concern and interest in the successful completion of the job [does] not rise to the level required to establish supervision, direction or control and is hardly uncommon for the ordinary homeowner" (*Stephens v Tucker*, 184 AD2d 828, 829). This Court has found that offering suggestions, lending tools, demonstrating areas where work should be done and requesting additional accommodations to ensure the proper performance of the work is not tantamount to interference with the manner in which the work is to be performed (*Pesa v Ginsberg*, 186 AD2d 521). In another decision having particular resonance in the present case, the court explicitly found that asking the worker to first apply siding to the front of the house in the event that siding ran out, requesting additional work involving, among other things, a roof overhang, and making decisions involving size, style and aesthetics, was " 'hardly the sort of "direction" or "control" contemplated by Labor Law § 240 or 241' [citations omitted]. Rather, these actions reflect the kind of concern to be expected of any homeowners interested in successful completion of their home" (*Sanna v Potter, supra*, at 983). Stated elsewhere, a homeowner "does not deprive himself or herself of the statutory exemption merely by presenting ideas and suggestions, observing or inspecting the work being performed and/or registering complaints in regard thereto," even if changes are made in the work as a result of homeowner requests (*Jenkins v Jones*, 255 AD2d 805, 806; *accord Stephens v Tucker, supra*). In a case involving occasional design changes, the homeowner's concern is with the finished product, which generally does not manifest directions in the manner that the work is to be performed (*Jacobsen v Grossman*, 206 AD2d 405).

When, as in the present case, the employer rather than the homeowner provided the tools and equipment and the employer provided work-related instructions and had to authorize the requested changes, the homeowner's lack of control as envisioned by the statute is further underscored (*Jenkins v Jones, supra*).

In the present case, in terms of who exercises the control over decisions on how the job is performed, plaintiff stated the obvious: a worker was going to directly respond to the person who directly paid him, from whom he also likely expected future work, rather than, in the case of conflicting directions, to the homeowner. As plaintiff articulated numerous times, the argument over the scope and scheduling of the work was between his employer and the homeowner and he kept himself out of it. He merely followed the instructions of his employer. As such, control over the job, and over worker safety, resides with the employer, and logically there, too, ultimate liability for worker safety should rest.

Moreover, expressions of dissatisfaction, and directing a worker to redo certain work as a result, even when coupled with scheduling demands, are not direction and control within the statute (*Kostyj v Babiarz, supra*). Where the homeowner was constantly present, constantly inspecting the work, climbing ladders when necessary for such purposes, and complaining about the progress and quality of the work, this was not effective control sufficient to impose section 240 (1) liability (*Valentia v Giusto*, 182 AD2d 987).

*Van Amerogen v Donnini* (78 NY2d 880), relied on by the majority, is inapposite. There, the non-resident owners used the premises solely for commercial purposes by renting out individual rooms to unrelated students. This factor, of course, takes such a case out of the section 240 homeowners' exemption. As the Court of Appeals noted, the house had always been used commercially, and the owners were "hardly * * * lacking in sophistication or business acumen such that they would fail to recognize the necessity to insure against the strict liability imposed by the statute" (at 882). They "are quite unlike '[the] homeowner who hires someone to paint his own living-room ceiling [who should be accorded the statutory exemption from strict liability]' * * * and are not within the class of persons the Legislature sought to exempt from the strict liability provisions of Labor Law §§ 240 and 241" (at 883, quoting *Cannon v Putnam*, 76 NY2d 644, 650). In the present case there is no commercial use of the premises in issue. *Rimoldi v Schanzer* (147 AD2d 541), also relied on by the majority, is clearly dis-

tinguishable. A significant fact in that case was the owner's statement on the building permit application that the owner was also the builder and supervisor of the construction, thus raising that very issue as an unresolved fact. The owners also exercised considerable supervision over the construction of a pool, including determining the shape, location, and size of the pool, as well as the consideration of alternative construction methods to get permit approval.

The majority also relies on the use of the old planking to evince the homeowner's control over the job. This argument, though, must also fail. Merely requesting that plywood not be wasted where it is not needed is not a manifestation of the control required by the significant body of case law (*supra*) as a predicate to imposing homeowner liability. Notably, the authority cited by the majority to support this proposition (*Galbraith v Pike & Son*, 18 AD2d 39 [1963]) is almost 40 years old and has long been eclipsed by statutory amendments and modern case law on Labor Law § 240. *Galbraith* relied on an older version of section 240, and involved commercial rather than residential property, so that the modern homeowner's exemption, enacted approximately 17 years after *Galbraith*, and the exception thereto did not exist then and was never in issue. However, even by its terms, it is inapplicable. The subcontractor defendant who had hired the subcontractor plaintiff provided an unsafe scaffold—the very harm sought to be avoided by section 240. Finally, the court concluded, it was irrelevant whether or not the defendant directed the manner of the plaintiff's performance, insofar as liability arose from the defective scaffold. Simply put, *Galbraith*'s ruling has no applicability to the present case.

The facts of the present case do not provide any logical basis to ignore the well-settled principles in the consistent body of case law and the clearly articulated legislative goals in order to impose liability on a homeowner who, though expressing dissatisfaction with the roofing work, and insisting that it be immediately finished, and even notwithstanding her unsuccessfully stating a preference as to where the work should start, did not in any manner exercise supervisory control over the manner of the worker's performance. Simply stated, no factual controversy survives these undisputed facts. Since I fail to see how we can disavow two decades of legislative and judicial history in this regard, I respectfully dissent. I would reverse and dismiss the complaint.